**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | Case Number: 18 CR 51(ENV) |
| | ) | |
| v. | ) | |
| | ) | |
| INNA CHEBANENKO | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM**

**NOW COMES**, the Defendant, Inna Chebanenko, by and through her attorney, Gal Pissetzky, and respectfully files the following Sentencing Memorandum. In support thereof, Mrs. Chebanenko states as follows:

### I. Introduction

Inna Chebanenko was just 20 years old when she left her home country of Ukraine to follow her dreams of living in United States. When she arrived, she immediately began working two jobs and did everything she could to ingratiate herself into American society. After a few years in Niagara Falls, Inna moved to Chicago, where she fell in love, began raising a family, and built a successful business. Mrs. Chebanenko was nothing short of the personification of the American Dream.

In March 2014, Mrs. Chebanenko opened a car dealership that offered services that included obtaining titles on the behalf of other dealerships. Part of the retitling process required certification by an Indiana police officer. Though the requirement seemed straightforward enough, it could take months to secure an appointment. For the vast majority of the dealership's existence, Mrs. Chebanenko operated her business legitimately, followed every regulation to the letter of the law, and patiently waited for an appointment. Regrettably and inexcusably, upon speaking with owners of other dealerships she did business with, Mrs. Chebanenko allowed

herself to be convinced an actual police officer inspection was an unnecessary process. Instead she was told to simply trusted the owner's assurances that his vehicles were properly repaired, and forg the police certifications to speed up the titling process. Inna obviously made the wrong decision to follow extremely bad advice, and she is the only one to blame for making this decision. It is a decision that led her before this court, convicted of a serious federal offense. It is a decision that she will regret for her entire life.

Though she desperately wishes that she could change her mistakes, Mrs. Chebanenko knows she cannot take back what she did. She comes before this court ready and willing to be held accountable for her actions, but still implores this court to resist the urge to send a person to prison who has lived her entire life doing the right thing. As will be further expounded upon below, Mrs. Chebanenko's commitment to never getting wrapped up in anything like this ever again and is earnest devotion to righting the wrongs she caused proves a sentence of Probation is "sufficient, but not greater than necessary". 18 U.S.C. § 3553(a).

## II. Offense Level Calculations and Objections

Mrs. Chebanenko pled guilty to a one count superseding indictment charging her with conspiring with others to commit wire fraud in violation of 18 U.S.C. § 1349. The base offense level is 7. The total loss Mrs. Chebanenko's actions contributed to causing is estimated to be more than $250,000 but less than $550,000 thereby increasing the offense level by 12 levels. The scheme involved 10 or more victims and the offense level is increased by an additional 2 levels. In its version of the offense, probation insists the sophisticated means enhancement applies because the offense was a "multi-layered fraud" and used corporate entities located in multiple states. PSR at 9. Contrary to probation's conclusions, a cursory review of the guideline shows Mrs. Chebanenko's conduct does not satisfy the enhancement's requirements.

The guideline defines 'sophisticated means' as an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG §2B1.1(b)(10), cmnt. n.9. The guideline further explains that sophisticated means occurs when a defendant "hid[es] assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . ." *Id.*

Every fraud entails some level of deception. Without deception, there is no fraud. The means Mrs. Chebanenko employed to obtain the inspection certifications were in no way sophisticated. As the PSR details, Indiana law only requires a certification from a state police officer that appropriate repairs were done for salvage vehicles titles to be converted into rebuilt titles. PSR at 3. Here, Mrs. Chebanenko admitted to forging the required state police officer certificates to obtain rebuilt title for the salvage vehicles. PSR at 5. Forging a document can hardly be described as "especially complex." If that would be the case, then every fraud case would employ sophisticated means.

The fact that the scheme involved business, *i.e.* car dealerships, is simply a red herring. Importantly, the car dealerships were not fictional entities or corporate shells and never utilized offshore financial institutions to hide assets. Mrs. Chebanenko's conduct boils down to forging a certificate. This conduct, though criminal in nature, is by no means "more intricate than that of a garden-variety fraud scheme," and this court should accordingly refrain from applying the enhancement. *United States v. Bryson*, 101 F.Supp.2d 147, 159 (D. Conn. 2015) (citing *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003)).

Though Mrs. Chebanenko vehemently objects to the sophisticated means enhancement, contesting this aspect of the PSR does not preclude a reduction for acceptance of responsibility. *United States v. Lee*, 653 F.3d 170, 174 (2d Cir. 2011). To be clear, Mrs. Chebanenko does not

deny the factual conduct that forms the basis of her conviction, and her timely guilty plea indisputably saved the government resources by "permitting the government to avoid preparing for trial." U.S.S.G. §3E1.1. Mrs. Chebanenko should accordingly receive a two-level reduction for accepting responsibility and an additional one level reduction, because the offense level is greater than 16. The resulting Total Offense Level is 18.

This is Mrs. Chebanenko's first arrest and conviction. Before this offense, she had absolutely no criminal history to speak of. Her zero Criminal History Points amounts to a Criminal History Category I.

A Total Adjusted Offense Level of 18 combined with Criminal History Category I results in a guideline range of 27-33 months. As further detailed below, the sentencing factors outlined by § 3553 prove a guideline sentence is too harsh.

**III. The Sentencing Considerations Pursuant to 18 U.S.C. § 3553(a) Support Probation**

After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable, but no greater than necessary under 18 U.S.C. § 3553(a). Over fifteen years ago, the United States Supreme Court ruled that the Sentencing Guidelines are only advisory in nature. *United States v. Booker*, 125 S. Ct. 738, 765-67 (2005). Importantly, the guideline range is only but a single factor for this court to consider. *Kimbrough v. United States*, 552 U.S. 85, 92 (2007). Sentencing courts do "not enjoy the benefit of a legal presumption that the Guideline sentence should apply." *Rita v. United States*, 551 U.S. 338 347, 351 (2007).

Accordingly, this court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to just the crime. *Pepper v. United* States, 562 U.S. 476, 131 S. Ct. 1229, 1240 (2011). The guidelines are simply the starting point, sentencing courts may not "rely exclusively on the Guideline range; rather, the court 'must make an individualized assessment

based on the facts presented' and other statutory factors." *Beckles v. United States*, 137 S. Ct. 886, 894 (2017) (quoting *Gall v. United States*, 552 U.S. 38, 49, 50 (2007)). Those statutory factors include:

> the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the defendant's guidelines range; any relevant policy statements; the need to avoid unwarranted sentence disparities among defendants with similar records; who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The statute further directs the sentencing court to impose the *shortest* sentence possible that:

> A) reflects the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) deters future criminal conduct; (C) protects the public from the defendant; and (D) provides the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553.

As the parsimony provision commands, sentencing courts shall only impose "a sentence sufficient, but not greater than necessary to comply with the purposes set forth" under 18 U.S.C. § 3553. In making an individualized assessment this court "has discretion to determine that . . . a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *United States v. Regalado*, 518 F.3d 143, 146 (2d Cir. 2008).

Here the totality of the circumstances surrounding the instant offense, Mrs. Chebanenko's personal history and characteristics, and low risk of reoffending all support a below guidelines

sentence of probation. These factors provide this court with a fuller and clearer picture. A picture unencumbered by the increasingly rejected postures of punishment for the sake of punishment. A picture that shows probation is more than enough to exact both the rehabilitative and punitive goals of sentencing. Such a sentence is not only feasible, but appropriate.

### A. Nature and Seriousness of the Offense

Mrs. Chebanenko pled guilty to conspiring with others to commit wire fraud through a scheme that resulted in a loss in excess of $250,000. Her actions amount to an undeniably serious offense. She is utterly ashamed and wishes nothing more than to go back and stop herself from doing what she did. Unfortunately, Mrs. Chebanenko cannot change the past and can only control how she lives her life going forward.

The scheme's seriousness notwithstanding, it is important to clarify what Mrs. Chebanenko's role was and how her business operated. For years, Mrs. Chebanenko's business would purchase cars from legitimate salvage auto auction houses like IAA and Copart. After purchasing the vehicles, the business would rebuild them, prepare a salvage restoration certification, and have the vehicle inspected, in accordance with state law, at an Indiana police station. Though the process seems straightforward enough, getting an appointment at an Indiana police station could take months. Once an appointment was secured, Mrs. Chebanenko would take the vehicles to a police station, show the officer the repair receipts, and allow the officer to personally inspect the vehicle. If everything checked out, as it consistently did, the officer would sign the certification stating that the car was inspected and rebuilt. Once the officer signed the certification, the business would send the repair receipts, certification, and application for a rebuilt title to the state title agency. The agency would then issue a rebuilt title, and Mrs. Chebanenko would resell the vehicle to a customer.

In addition to going through this process to resell the vehicles at her dealership, Mrs. Chebanenko's business also assisted other dealerships with the retitling process. Just as she did when she went through the process for her dealership, Mrs. Chebanenko required receipts showing the vehicle had been properly repaired. In the instant offense, Pasternak sent Mrs. Chebanenko receipts that purportedly showed the cars were properly repaired. Stupidly, Mrs. Chebanenko believed Pasternak. Compounding this horrible lapse in judgement and believing that the inspection would go off without a hitch, Mrs. Chebanenko forged the police certifications to speed up the process.

Though this conduct was inexcusable, it cannot be stressed enough that Mrs. Chebanenko had absolutely no idea that Pasternak's receipts were fake. Mrs. Chebanenko never sold a fake rebuilt car to a customer and did not commit this offense to build a lavish lifestyle at the expense of innocent victims. Her conduct did not produce windfall profits stemming from cuts of Pasternak's sales of worthless cars to unsuspecting customers. Instead, Mrs. Chebanenko charged Pasternak the same fees she charged any other dealership.

To be clear, Mrs. Chebanenko is not asking this court to view her as completely innocent pawn. Though she had absolutely no idea that Pasternak was lying to her about actually fixing the vehicles, Mrs. Chebanenko knew she should not have forged the certifications and stopped avoiding the police inspection process long before she was ever contacted by law enforcement, arrested, and charged. When law enforcement did contact her, Mrs. Chebanenko self-surrendered and fully cooperated with authorities. Instead of going to trial, Mrs. Chebanenko admitted to committing this offense and took full responsibility for her actions. Her guilty plea saved the government countless hours and resources trial preparation requires. As her case worked its way through the system, she continued to operate her car dealership and title business legitimately.

For nearly three and half years, Mrs. Chebanenko has been nothing short of a model pre-trial releasee. This is the true Inna. Honest, accountable, and remorseful. Character traits that shine through even in the darkest of circumstances.

**B. Mrs. Chebanenko's History and Characteristics**

We are all more than the worst decision we've made. Mrs. Chebanenko is no different. Discounting Mrs. Chebanenko's distinct traits and life experiences would undermine our system of justice that is not a disinterested assembly line, but rather a system that treats every individual attentively and fairly. Indeed, no one who knew Inna could have foreseen her traveling down the road that led to a federal felony conviction.

Growing up in Ukraine, Mrs. Chebanenko always viewed education and hard work as the path that would lead to success. As young woman, Mrs. Chebanenko attended three years of college at European University. Going into her final year, Mrs. Chebanenko was approached with an opportunity that she could not pass up - a visa that would allow her to work in the United States. Inna immediately jumped at the opportunity and set off for America. When she arrived, Mrs. Chebanenko began working as a housekeeper at a hotel in Niagara Falls, New York. Though the hours were long, Mrs. Chebanenko took it upon herself to get a second job at McDonalds.

Towards the end of her visa's term, Mrs. Chebanenko decided to travel to Chicago - a larger city with more opportunity. She wasn't in the 'windy city' long before she met, fell in love, and married her husband Dimitry Chebanenko. After their marriage, Mrs. Chebanenko enrolled in nursing school. Following her third semester, she became pregnant with the couple's first child, Oleg. Deciding to put off school to raise Oleg, Mrs. Chebanenko devoted every

second of her day to motherhood. Two years later, Mrs. Chebanenko gave birth the couple's second child, Valeriya.

Mrs. Chebanenko loves every second of being a mom. She makes sure that she cooks every meal, signs her children up for every activity they want to try, and reads to them before bed every night. Though being a mom for two young children came with a seemingly never-ending to-do list, Mrs. Chebanenko still wanted to pursue her dream of owning a small business. And so, because Inna and her husband had grown close to many people who worked in body shops, the couple went into the car business. Over the years, the Chebanenko's built their dealership into a reputable, successful, and legitimate business.

Regrettably, Inna allowed herself to be convinced that some rules did not need to be followed. Even though she truly believed Pasternak repaired the vehicles she worked to retitle, Inna always knew what she was doing was wrong. Mrs. Chebanenko spent her entire life committed to working hard and doing the right thing. The first time she ever ignored her conscience led to a federal felony conviction. A crime, that will follow her forever.

The guilt and shame Mrs. Chebanenko feels for letting down her husband and children, the people who depend on her the most, will be the harshest consequence that will outlast any prison sentence. She still has not told her children about her offense and dreads the day that she will have to look them in the eye and tell them what she did. That day, however, is incomparable to all the days she may miss as they grow up from young children to young adults. The pain Mrs. Chebanenko feels when she imagines sitting behind bars during these formative years is indescribable.

Though Mrs. Chebanenko faces a mountain to climb, she remains determined, just as she always has, to overcome, move forward, and be the person her family, and so many others,

looked up to. She may have hit rock bottom, but as the 35 years preceding this offense have shown, she is more than capable of building a life from the ground up. Indeed, though her arrest and guilty plea have already taught her so many lessons, the circumstances have not prevented her from moving forward. For the past three years, Mrs. Chebanenko has continued to operate her business legitimately. There is absolutely zero basis to believe she will not continue to do so for the rest of her life.

### C. Recidivism, Deterrence, and Other Policy Considerations

Mrs. Chebanenko poses absolutely no threat or risk of reoffending - she is a non-violent offender who had zero criminal history before committing this offense. Since her arrest, Mrs. Chebanenko recommitted herself to being the mother her family needs her to be, continued to operate her business by the book, and began paving the path of retribution. Indeed, during her nearly three and a half years on pre-trial release, Mrs. Chebanenko has not violated a single condition and remained nothing short of a model releasee. These actions show this court does not need to place Mrs. Chebanenko behind bars to protect society.

To be clear, these assurances are not just anecdotal. Recent statistics compiled by the United States Sentencing Commission indicate Mrs. Chebanenko has a significantly lower likelihood to recidivate than the average offender. The average rearrest rate for federal offenders is nearly 50%. *Recidivism Among Federal Offenders: A Comprehensive Overview*, United States Sentencing Commission, Mar. 2016, at 15, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf. The Commission found that "criminal history score and Criminal History Category are strong predictors of recidivism." *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, United States Sentencing

Commission, Mar. 2017, at 6, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12. Only 30.2% of offenders who have zero criminal history points, like Mrs. Chebanenko, are rearrested. *Id.* What's more, offenders with zero criminal history points who had no prior contact with the criminal justice system, like Mrs. Chebanenko, have an 11.7 percentage point lower recidivism rate (25.7% compared to 37.4%) than those who have zero criminal history points despite being previously arrested or had convictions that do not receive points. *Id.*

Imposing a probationary sentence further reduces the likelihood of rearrest. 35.5% of offenders age 30-39 who are sentenced to probation are rearrested, compared to 56.9% of the same age group who receive prison sentences between 24 – 59 months -sentences that fall within Mrs. Chebanenko's guideline range. *The Effects of Aging on Recidivism Among Federal Offenders*, United States Sentencing Commission, Dec. 2017, at 26, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf. Mrs. Chebanenko's years of college also indicate a reduced risk of recidivism -those who complete some college have a rearrest rate 11 percentage points lower than those who only graduated high school. *Id.* at 24.

As for deterrence, it is usually divided into two subcategories, specific and general. Of course, specific deterrence is to deter Mrs. Chebanenko from obtaining fraudulent vehicle titles ever again. Mrs. Chebanenko stands convicted of a federal offense and will be branded a felon for the rest of her life. Yet, these markings hardly hold water to the emotional toll these proceedings have taken on her. Mrs. Chebanenko let down her husband, children, and community. Mrs. Chebanenko's crimes will forever tarnish her reputation she worked so hard to

build. Mrs. Chebanenko does not need to be confined to a prison cell to specifically deter her from committing any crime ever again.

As to general deterrence, a message certainly needs to be sent to the community at large that fraud will not be tolerated and will be punished. Sending Mrs. Chebanenko to prison, however, is not the proper vessel to deliver that message. Just like the recidivism research detailed above, the empirical deterrence statistics show little to no relationship between sentence length and deterrence. Countless studies find the certainty of punishment, not its severity, deters crime. *See United States v. Kloda*, 133 F. Supp. 2d 345, 347-48 (S.D.N.Y. 2001) (Hellerstein, J.) (in context of business crimes); *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 Crime & Just. 143 (Univ. of Chicago 2003) (arguing that severity of punishment does not deter crime); Jeffrey Grogger, *Certainty vs. Severity of Punishment*, 29 Econ. Inquiry 297, 308 (1991) (concluding increased certainty of punishment generates significant deterrent effects while increased severity produces insignificant results); William N. Trumbull, *Estimations of the Economic Model of Crime Using Aggregate and Individual Level Data*, 56 S. Econ. J. 423, 427-37 (1989) (analyzing data to conclude certainty of punishment has greater deterrent effect than severity); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data*, 94 Q.J. Econ. 57, 81-83 (1980) (maintaining certainty of punishment produces greater deterrent effect than severity of punishment).

Just as the above studies conclude, the certainty of punishment here, *i.e.* the inevitability of getting caught, prosecuted, and punished, deters the public, not the severity of prison time. To be clear, Mrs. Chebanenko's conduct in this case has already resulted in certain punishment, a federal felony conviction, which will affect numerous aspects of her life going forward. Congress specifically made available a sentence of probation because it believed that such a

sentence could be sufficient punishment under certain circumstances. Following this logic, the Supreme Court has upheld a non-incarceration sentence.

In *Gall v. United States*, the defendant pled guilty to drug conspiracy in which she admitted to being responsible for at least 2,500 grams of ecstasy. 552 U.S. 38, 42 (2007). Though the advisory guideline range was 30 to 37 months imprisonment, the district court sentenced the defendant to 36 months probation. *Id.* at 43-44. Explaining the sentence, the sentencing judge cited the defendant's lack of criminal history, family support, and significant self-rehabilitative efforts following the offense. *Id.* at 44. The government appealed and the Eighth Circuit reversed the sentence finding it to be too lenient.

Rejecting the Eighth Circuit's conclusions, the Supreme Court asserted the sentencing court "quite reasonably attached great weigh to [the defendant's] self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative." *Id.* at 59. Such actions, the Court continued, "lends strong support to the conclusion that imprisonment was not necessary to deter [the defendant] from engaging in future criminal conduct or to protect the public from his future criminal acts." *Id.* Here, like *Gal*, Inna recommitted herself to her family, continued to operate her business legitimately, and did not violate a single condition of her pretrial release for over three years.

Make no mistake, the sentence Mrs. Chebanenko requests is a serious one and befits the offense of conviction. As the *Gall* Court observed, a felony conviction and a sentence of probation are serious punishments. *See id.* at 44 (affirming with the district court's assertion "that probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom.'"). While custodial sentences are qualitatively more severe than probationary sentences of equivalent terms, offenders sentenced to probation are nonetheless subject to conditions which restrict their

liberty. Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. *United States v. Knights*, 534 U.S. 112, 119 (2001). For example, those subjected to probation may not leave the judicial district, move, or change jobs without notifying, and, in some instances, receiving permission from their assigned officer or the court. *Id.* In addition, they must report regularly to their officers, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and abstain from excessive drinking. U.S.S.G. § 5B1.3. Furthermore, most are also subject to individual "special conditions" imposed by the court.

Finally, Mrs. Chebanenko will always face the possibility of harsh punishment, including revocation of her probation and a prison sentence, if she violates any conditions imposed by this court. Indeed, such a possibility was a condition of her pre-trial release. Just as it did over the past three years, knowing that she may be sent to prison upon even the slightest violation of her probation will continue to remind the general public, and specifically, Mrs. Chebanenko that probation is a harsh punishment. Mrs. Chebanenko, however, will not reoffend or not violate her sentence. Just as she has for the last three years, she will continue to rehabilitate herself and work as hard as she can to be a productive member of society.

**CONCLUSION**

Mrs. Chebanenko has expressed clear remorse for her offense and will never reoffend. Despite her transgressions, she has great potential for continued success. A probationary sentence will strike the proper balance of both the rehabilitative and punitive goals of sentencing. As the parsimony provision commands, this court should impose the minimum sentence necessary to accomplish the rehabilitative and other purposes of criminal punishment. Effectuating this point, Former Attorney General Holder remarked, "we need to ensure that

incarceration is used to punish, deter and rehabilitate — not merely to convict, warehouse and forget." Department of Justice, Attorney General Eric Holder Delivers Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013), http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html. These words remain true even under a new Department of Justice Administration. Mrs. Chebanenko pleads this Honorable Court to impose a sentence of probation, which is sufficient but not greater than necessary to comply with the various sentencing considerations.

Respectfully submitted,

/s/ Gal Pissetzky_____
Gal Pissetzky
Attorney for Mrs. Chebanenko
35 E. Wacker Dr., Suite 1980
Chicago, IL 60601
(312)-883-9466
gal@pissetzky.com

## CERTIFICATE OF SERVICE

The undersigned, Gal Pissetzky, hereby certifies that in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, and the General Order on Electronic Case Filing (ECF), the

## SENTENCING MEMORANDUM

was served on June 18, 2021, pursuant to the district court's Rules.

Respectfully submitted,

/s/ Gal Pissetzky\
Gal Pissetzky\
Attorney for Mrs. Chebanenko\
35 E. Wacker Dr., Suite 1980\
Chicago, IL 60601\
(312)-883-9466\
gal@pissetzky.com